IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CR No. 05-98T |
| | : | |
| RICHARD HATCH | : | |

**GOVERNMENT'S MOTION FOR A 2-LEVEL ADJUSTMENT FOR OBSTRUCTION OF JUSTICE**

The United States of America, by and through its undersigned attorneys, respectfully submits this Motion for a 2-Level Adjustment for Obstruction of Justice. In support of this Motion, the government submits the attached Memorandum of Law.

Respectfully submitted,

UNITED STATES OF AMERICA

By its Attorneys,

ROBERT CLARK CORRENTE
United States Attorney

ANDREW J. REICH
Assistant U.S. Attorney

LEE H. VILKER
Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on the 4th day of April, 2006, a copy of the within Government's Motion, was mailed by overnight mail, postage prepaid, to the following:

John MacDonald, Esq.
One Turks Head Plaza
Suite 1440
Providence, R.I. 02903

Michael Minns, Esq.
9119 South Gessner
Suite One
Houston, TX 77074

Lisa M. Steele

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CR No. 05-98T** |
| | : | |
| **RICHARD HATCH** | : | |

**GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A 2-LEVEL ADJUSTMENT FOR OBSTRUCTION OF JUSTICE**

The United States of America, by and through its undersigned attorneys, respectfully submits this Memorandum of Law in Support of its Motion for a 2-Level Adjustment for Obstruction of Justice. As detailed below, the United States submits that the defendant obstructed justice by committing perjury during his trial testimony and by providing materially false information to a probation officer. Therefore, a 2-level adjustment should apply pursuant to section 3C1.1 of the Guidelines.

Section 3C1.1 of the Guidelines states:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (I) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

Among the examples of conduct that may qualify under an obstruction of justice enhancement are:

> (b) committing, suborning, or attempting to suborn perjury;
>
> ...
>
> (h) providing materially false information to a probation officer in respect to a presentence or other investigation for the court;

U.S.S.G. § 3C1.1, comment (n.4).

**A. Perjury at trial**

The defendant testified during his trial. In his testimony, he made numerous material misrepresentations concerning the essential facts of this case. The defendant's abuse of his oath of truthfulness compounded his criminal liability and should result in an upward adjustment for obstruction of justice.

A determination of whether a defendant provided material false testimony is an "inescapably factbound" inquiry for the Court. United States v. Cash, 266 F.3d 42, 44 (1st Cir.2001); United States v. David, 940 F.2d 722, 739 (1st Cir.1991); See also United States v. Villarman-Oviedo, 325 F.3d 1, 16 (1st Cir. 2003); United States v. Rowe, 202 F.3d 37, 43 (1st Cir. 2000). The inquiry, however, may be guided by the commentary to the guidelines which clearly states that:

> This provision is not intended to punish a defendant for the exercise of a constitutional right. A defendant's denial of guilt (other than a denial of guilt under oath that constitutes perjury), refusal to admit guilt or provide information to a probation officer, or refusal to enter a plea of guilty is not a basis for application of this provision. In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements

> sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice.

U.S.S.G. § 3C1.1, comment (n. 2).

In addition, the First Circuit has advised that:

> Before imposing an obstruction of justice enhancement predicated on perjurious testimony, a sentencing court must survey the trial evidence to ascertain whether it establishes that the defendant gave 'false testimony concerning a material matter with the willful intent to provide false testimony rather than as a result of confusion, mistake, or faulty memory.' United States v. Dunnigan, 507 U.S. 87, 94, 113 S.Ct. 1111, 1116, 122 L.Ed.2d 445 (1993). The court's findings need not be precise to the point of pedantry. While separate findings as to each element are preferable, the sentencing court's determination is sustainable so long as it "encompasses all of the factual predicates." Id. at 95, 113 S.Ct. at 1117.

United States v. McKeeve, 131 F.3d 1 (1st Cir. 1997)(holding that the overwhelming weight of the credible evidence contradicted the appellant's professions of ignorance).

During his trial testimony, Hatch offered testimony that directly contradicted the testimony of every key witness on almost every significant point, including, most notably, conversations he had with his accountants concerning the amount of income he earned in the relevant years.

The falsity of defendant's testimony can be seen not only by the testimony of disinterested third party witnesses, but also by

the manner in which Hatch's testimony was belied by common sense and documentation admitted at trial.

Hatch's intentional misrepresentations under oath can be divided into three distinct sub-categories:
(1) misrepresentations concerning conversations he had with Jodi Rodrigues-Wallis ("Wallis") concerning his income during 2000 and 2001, (2) misrepresentations concerning statements he made to Richard Plotkin ("Plotkin") concerning his income for 2000, and (3) misrepresentations concerning the altering of the $25,000 check Chambers Communications sent to Horizon Bound. We will delineate each of these three areas of perjury independently.

1. <u>Misrepresentations Concerning Statements Made To and From Wallis</u>

As the Court is aware, Wallis is the accountant who prepared all of the filed tax returns at issue in this case. She testified extensively about the various conversations she had with Hatch concerning his income during 2000 and 2001, and how she relied on those statements to prepare Hatch's tax returns. During his testimony, Hatch testified about these same conversations and denied having made to Wallis many of the statements she attributes to him. Hatch's testimony on these points was obviously material to the central issue at trial, that is, whether he acted willfully when he filed false tax returns. Hatch's testimony on these critical conversations was blatantly false as it directly contradicted the testimony of Wallis (who

had no personal interest in the outcome of the case) and made no sense given other evidence that was introduced at trial, including the actual returns that Wallis prepared.

a. One glaring area of perjury is Hatch's testimony concerning statements he made to Wallis concerning his business income in 2000. Wallis testified that Hatch told her that he had no business income in 2000 other than the income from the *Survivor* show because he was consumed with that show for the entire year. (Tr. 1/17 at 85, 86) She further testified that Hatch never provided her with any 1099's (other than the one from Survivor Entertainment Group) that Hatch had provided the Plotkin firm and that she was never provided with a copy of Exhibit 124, Hatch's hand-written summary of all his business and employee income during 2000. (Tr. 1/17 at 91-94) Based on Hatch's representations that he had no business income in 2000, Wallis prepared a Schedule C for 2000 that reported that Hatch earned no business income for the year. (Exh. 3)

Hatch, in turn, testified that he not only provided Wallis with all of the same 1099's and invoices he provided the Plotkin firm (Tr. 1/23 at 21), but he also provided Wallis with his hand-written summary detailing all of that income. (Tr. 1/23 at 22-23). Moreover, Hatch denied ever telling Wallis that he had no other business income for the year 2000:

> Q: And did you hear her testimony that she had a specific conversation with you about other business

> income during the year 2000, and that you told her that you were so busy with *Survivor* the whole year, that you didn't have any time to make any other money?
>
> A: That's not true.

(Tr. 1/23 at 25). Not only does Hatch's testimony on these points directly contradict that of Wallis, it is belied by the very return that Wallis prepared. There is no rational explanation as to why Wallis would prepare a tax return claiming that Hatch had no business income if she had in fact been provided with numerous documents indicating significant business income for the year 2000.

b. Another important aspect of the Government's evidence of willfulness was defendant's efforts to conceal from Wallis the fact that the Plotkin firm had already prepared a 2000 return on his behalf. Wallis was very clear that when she was preparing Hatch's 2000 return she had no knowledge that any other accountant had already prepared a 2000 return for Hatch. (Tr. 1/27 at 83) Moreover, Wallis testified that Hatch explicitly told her that he did not want her contacting the Plotkin firm. (Tr. 1/27 at 84) During his testimony, Hatch offered a completely different picture:

> Q: Are you testifying that you told Ms. Wallis that the Plotkin firm had already prepared a 2000 tax return?
>
> A: Absolutely.
>
> . . . .

> Q: Did you hear Ms. Wallis's testimony concerning those events, specifically her testimony that you instructed her not to contact the Plotkin firm?
>
> A: I did hear what she said, and I believe she's incorrect. I believe she was pressured by you.

(Tr. 1/23 at 15) Although Hatch blames Wallis' testimony on government coercion, the clear truth is that Hatch intentionally lied to the jury when he testified that he "absolutely" informed Wallis that the Plotkin firm had already prepared a 2000 tax return.

c. Hatch's testimony on the critical issue of the *Survivor* income was equally false. Wallis testified in no uncertain terms that she told Hatch that the *Survivor* income needed to be included on his 2000 return. (Tr. 1/18 at 25) In a deliberate effort to mislead the jury into believing that he did not act with the requisite willfulness, Hatch denied that Wallis ever told him that he needed to declare the *Survivor* income:

> A: Jodi - Jodi told me that this was a weird situation. She knew for the entire time that we had been working on the returns, that I was trying to figure out how I could document what was actually supposed to happen with regard to the taxes on the million. And she expressed how odd it seemed to her, expressed that she couldn't recommend or be associated with the return that didn't include the million dollars . . .

d. A critical moment of Hatch's testimony took place when he explained why he filed the "informational" return that had been prepared by Wallis that did not include the *Survivor* income. Wallis testified that before handing Hatch a copy of the

informational return on November 19, 2002, she provided Hatch with a letter instructing him that the return was for informational purposes only and was not to be filed with the IRS. (Tr. 1/18 at 33-36). She testified that she saw Hatch read and sign this letter and that she also told him orally that the return could not be filed with the IRS. (Tr. 1/18 at 33, 34) Faced with his own signature on a document confirming that the return was not to be filed, Hatch offered a preposterous explanation for what transpired that day. Although his signature appeared directly under the acknowledgment section of the letter, Hatch claimed that he did not read the letter. (Tr. 1/23 at 39.) Moreover, Hatch claimed that Wallis never told him that the return should not be filed with the IRS:

> Q: And then did Jodi tell you, as it says in the letter, not to file the return with the figures that the Government had given you?
>
> A: She did not tell me not to file that return. She told me she couldn't be associated with that return.

(Tr. 1/20 at 121, 122) Hatch's testimony that Wallis implicitly authorized the filing of the return (despite her refusal to sign the return and her preparation of a letter specifying that the return was not to be filed) should be seen for exactly what it is: a deliberate attempt to mislead the jury into believing he filed the false 2000 tax return in good faith.

e. Finally, Hatch deliberately misrepresented the substance of material conversations he had with Wallis concerning

his income for the year 2001. The trial evidence showed that during 2001, a radio station in Boston paid a corporation Hatch established, Tri-Whale Enterprises, Inc. ("Tri-Whale"), more than $320,000. All of this money was paid directly into a bank account Hatch established for Tri-Whale at Newport Federal Savings Bank. During her testimony, Wallis emphasized that Hatch told her that he had not established a separate bank account for Tri-Whale:

> Q: Did you ever have a conversation with Mr. Hatch concerning whether Tri-Whale had a separate bank account?
>
> A: Yes, I did. I asked him if there was a separate checking account, that he would have a check register that I could use to come up with the income and expense items, and he indicated that he did not have a separate business account.

(Tr. 1/18 at 43) Not unexpectedly, Hatch claimed he never told Wallis that he did not have a separate business account for Tri-Whale:

> Q: And in preparing this return, she asked you if Tri-Whale had a separate bank account because she wanted to review the bank activity?
>
> A: I heard that testimony, but I don't recall her asking me that and would never have told her that I didn't.
>
> Q: So her testimony that you told her you did not have a separate account for Tri-Whale was inaccurate?
>
> A: It was.

(Tr. 1/23 at 47) This testimony was central to 2001 tax evasion count, as Hatch's efforts to conceal his Tri-Whale account from

Wallis provided substantial evidence that he knew he had to declare the radio station income that was being deposited into that same account.

2. Misrepresentations Concerning Statements Made To and From Plotkin

a. Plotkin testified that when he first met with Hatch in March 2001, it was clear that the Survivor winnings were taxable. Plotkin testified that he communicated this to Hatch, and that Hatch expressed no doubt about the fact that the winnings were taxable. (Tr. 1/17 at 9) He also testified that during the 5 to 10 telephone conversations he had with Hatch following this initial meeting, the subject of the taxability of the winnings never came up, and that Hatch never expressed any doubt or concern about whether he was required to pay taxes on the winnings. (Tr. 1/17 at 13) Finally, Plotkin testified that during his last meeting with Mr. Hatch, when he reviewed the final 2000 return with him, there was no conversation or question raised about whether to include the winnings in the tax return. (Tr. 1/17 at 35-36)

Hatch, on the other hand, testified that Plotkin was "absolutely incorrect" in stating that he, Hatch, never expressed any doubt to him about the taxability of the winnings. Hatch testified that "I asked him to look into it and he said that it was clear to him and he wasn't willing to look into it." (Tr. 1/20 at 172-73)

b. Plotkin testified about a handwritten document that Hatch provided to his accounting firm concerning property that Hatch owned at 21 Annandale Rd. in Newport. (Exh. 125) According to Plotkin, the portion of the document that states "2000 - no rental income - property in renovation," was written by Hatch. (Tr. 1/17 at 30-31) Plotkin subsequently sent a letter to Hatch asking him how much rent he received on this property, since Hatch had indicated in another conversation that the property was rented our for a few months during the summer. (Exh. 127, Tr. 1/17 at 32) According to Plotkin, Hatch subsequently advised the firm that he received $4000 in rental income for the 21 Annandale Rd. property in 2000, and this amount was reflected in the 2000 return that was prepared by Plotkin's accounting firm. (Tr. 1/17 at 29, 34-35)

Hatch, on the other hand, testified that he never provided the $4000 figure to the Plotkin firm, and that they came up with that number on their own:

> Q: But you told them you only received $4000?
>
> A: That's not true.

(Tr. 1/20 at 185)

> Q: Didn't you tell the Plotkin firm that you only received $4000 in rent in the year 2000?
>
> A: I did not.

(Tr. 1/20 at 188)

> Q: So they somehow made up this $4000 number?

> A: Well, I think Plotkin testified that he talked with Laura and remembered that it was brief period, and then, I'm assuming, came up with that figure on his own. Absolutely.

(Tr. 1/20 at 189)

3. Misrepresentations Concerning the $25,000 check from Chambers Communications

It was undisputed at trial that in December, 2000, Hatch received a $25,000 check from Chambers Communications that was payable to Horizon Bound. On Friday, December 15, 2000, Hatch attempted to deposit this check into his personal bank account at Newport Federal Savings Bank using an ATM machine. On Monday, December 18, the bank rejected the deposit and returned the check to Hatch, advising him that a check payable to a corporation could not be deposited into a personal account. On that same day, December 18, Hatch deposited the check into his personal account at People's Credit Union.

Julie Henderson was working as a bank teller at People's Credit Union on December 18. She testified that Hatch came to the drive-up window of the bank to make the deposit. (Tr. 1/23 at 185) This was the only time she saw Hatch in person, and she recognized him from the Survivor show. (Tr. 1/23 at 185-86) She testified that the check was made payable to "Horizon Bound - Richard Hatch" when it was given to her, and that she deposited the check into Hatch's account. (Tr. 1/23 at 186) She testified that since the check was over $2500, pursuant to bank policy her

manager initialed the front of the check. (Tr. 1/23 at 186-87) Ms. Henderson testified that other than greeting Hatch, she engaged in no conversation with him. (Tr. 1/23 at 186-87) She also testified that if the check had been payable only to Horizon Bound, she would not had allowed the check to be deposited into Hatch's personal account. (Tr. 1/23 at 188) She also testified that neither she nor anyone else in the bank altered the check in any way. (Tr. 1/23 at 188-89)

Hatch, on the other hand, testified that he went inside the bank and explained to the teller what happened at Newport Federal Savings Bank. (Tr. 1/23 at 61-62) Hatch also testified that he did not alter the check.

> Q: And your testimony is that you're not the one that added your name to the check?
>
> A: Correct.
>
> Q: That the teller did?
>
> A: I don't know whether the teller or the manager, but it was a discussion we had about Newport Federal telling me that the name had to be on there in order for it to go on, and it was their policy that it couldn't be just deposited the way it was.

(Tr. 1/23 at 62)

Hatch's explanation regarding the alteration of the check from Chambers Communications is not only inconsistent with the testimony of Ms. Henderson, but it flies in the face of common sense. When Hatch deposited the check into his personal account at People's, he already knew that Newport Federal had rejected

the deposit because his name did not appear as an additional payee on the check. It is preposterous to believe that an employee of People's, on her own, and acting against bank policy, would alter the check so as to permit it to be deposited into Hatch's personal account.[1]

**B. False information to probation officer**

In December, 2004, a Plea Agreement and Information were filed with the District Court. On January 18, 2005, prior to the defendant's initial appearance before the Magistrate Judge, the defendant was interviewed by Charleen Tryhubczak from the U.S. Probation Office. During that interview Mr. Hatch was asked to disclose all of his assets. The only real property which Hatch disclosed to Ms. Tryhubczak at that time was property which he owned at 21 Annandale Rd., Newport, R.I.

On September 8, 2005, the Indictment was returned against the defendant in the case at bar. On September 16, 2005, prior to

---

[1] Hatch may argue that his acquittal on the bank fraud charge necessarily means that the jury found his testimony to be true, or that the issue of whether the check was altered was not "material." Neither conclusion would be correct. Although it is impossible to ascertain exactly how the jury reached its verdict, their acquittals on the other fraud counts suggest that they determined that there was no harm to the bank or to Chambers when Hatch deposited the funds into his People's bank account. This conclusion could have been premised on Hatch's argument at trial that he spent other personal funds on Horizon Bound purposes. The jury's verdict, however, does not mean that they concluded that Hatch was truthful when he testified that he did not alter the check. Also, the issue of alteration was clearly material, since the crux of the bank fraud count, as charged in the Indictment, was the allegation that Hatch altered the check in question.

the defendant's arraignment before the Magistrate Judge, the defendant was interviewed again by Ms. Tryhubczak. Ms. Tryhubczak reviewed the previous financial information which the defendant provided to her, and asked the defendant whether there was any change in his financial situation. The defendant told Ms. Tryhubczak that he sold the property at 21 Annandale Rd. to his sister.

The trial of this case took place in January 2006. During the trial the government received information that the defendant owned real property in Canada. On the day of his finding of guilt, the government advised the Court of the existence of the defendant's property in Canada, and of his failure to disclose it to the Probation Office. The Court decided to hold the defendant in incarceration pending sentencing.

On February 8, 2006, subsequent to the guilty verdict and the government's disclosure of the Canadian properties, the defendant was interviewed by Probation Officer Kristin Mattias. At that time the defendant disclosed that he had purchased lots in Michigan and in Nova Scotia in 2000, and that their fair market values, after taxes, were respectively negative $20,000 and negative $5000.

The government has since obtained additional information regarding these properties. It has learned that in 2002 the defendant bought 44 parcels of property in Nova Scotia. Attached

to this Memorandum is a spreadsheet, marked Exhibit A, which was provided to the Probation Office by Canadian authorities. It reveals that these property have a current taxable market value of approximately $219,000 (all dollar amounts referred to in this Memorandum are in U.S. dollars).[2]

In addition, the government has received information which reveals that in 2002 the defendant purchased 10 lots in Michigan, one of which was sold in 2003. A listing of these properties is contained in attached Exhibit B, which shows that the nine remaining properties have a total current assessment of $96,900.

The defendant's false information to the Probation Office concerning his ownership of real property was "material" within the meaning of Guideline § 3C1.1 Commentary 4(h) and 6, in that the information, if believed, "would tend to influence or affect an issue under determination".

Disclosure of financial information to the Probation Office serves two purposes. First, it is used by the Court in determining whether, and in what amount, to set bail at prior to trial. The defendant's "financial resources" are one of the factors which the court is to consider in determining whether there are conditions of release that will reasonably assure the

[2] Although the government refers to the dollar values of various properties in this Memorandum, the crucial issue is the defendant's failure to disclose the existence of the properties, regardless of what their values may be.

appearance of the defendant at trial. See 18 U.S.C. § 3142(g)(3)(A). Ownership of real property outside the United States is of even greater significance, since it is a factor which may reflect an increased likelihood of flight. In fact, the defendant's ownership of property in Canada was one of the factors which this Court relied upon in deciding not to release the defendant pending sentencing.

The defendant's ownership of real property is also a factor which the Court considers in determining the amount of fine to impose at the time of sentencing. 18 U.S.C. § 3572(a)(1) specifically provides that in determining whether to impose a fine, and the amount, the court is to consider the financial resources of the defendant.

The defendant's false information to the Probation Office regarding his ownership of real property in Canada and Michigan was therefore both false and material, and therefore requires the imposition of the Obstruction Adjustment under Guideline § 3C1.1.

## C. Conclusion

For all of the above reasons, the government urges this Court to impose to 2-level adjustment for Obstruction of Justice.

Respectfully submitted,

UNITED STATES OF AMERICA

By its Attorneys,

ROBERT CLARK CORRENTE
United States Attorney

ANDREW J. REICH
Assistant U.S. Attorney

LEE H. VILKER
Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on the 4th day of April, 2006, a copy of the within Government's Memorandum of Law, was mailed by overnight mail, postage prepaid, to the following:

John MacDonald, Esq.
One Turks Head Plaza
Suite 1440
Providence, R.I. 02903

Michael Minns, Esq.
9119 South Gessner
Suite One
Houston, TX 77074

/s/ Donna M. Steele